UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOLIE PARHAM,

Plaintiff,

- against -

ROKU, INC., CODY FRANKEL, and HEATHER LINK,

Defendants.

ECF Case No. 26-cv-2971

**COMPLAINT AND JURY DEMAND**

Plaintiff Jolie Parham, by her attorneys, Bantle & Levy LLP, as and for her complaint against Defendants Roku, Inc., Cody Frankel, and Heather Link, alleges as follows:

## NATURE OF THE ACTION

1. This is an action for employment discrimination based on race and disability in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), Title VII, 42 U.S.C. § 2000e *et seq* ("Title VII"), Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. (the "ADA"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. (the "NYCHRL"), and unlawful retaliation in violation of Section 1981, the ADA, Title VII, the NYSHRL, the NYCHRL, and the New York Labor Law (the "NYLL") § 740 *et seq*. Plaintiff seeks declaratory and injunctive relief and damages.

2. Plaintiff Jolie Parham ("Parham"), a 25-year-old Black woman, commenced employment as an Account Coordinator at Roku, Inc. ("Roku" or "the Company") in April 2024. Parham was a diligent, productive, and stellar performer at Roku.

3. Notwithstanding her excellent performance, Parham endured racially motivated harassment from an account executive at the Company, Defendant Heather Link ("Link"), who Parham was assigned to support. Among other racist statements and actions, Link condescended to Parham, consistently and deliberately called Parham by the wrong name, openly discussed her own drug use with Parham "because of who [Parham was]", and even discussed the varying colors of individuals' genitalia based on race in front of Parham and other people of color. Notably, Link was notorious at Roku for her hostility towards non-white employees, and Parham personally observed that Link made negative and unwarranted comments about other Black employees in front of Parham.

4. Moreover, Link treated Parham unfavorably by assigning her a far greater number and volume of assignments than any of Parham's non-Black account executive peers were assigned.

5. Link's racist mistreatment of Parham escalated when Parham was assigned a new manager in Fall 2024, Defendant Cody Frankel ("Frankel"). When Parham complained of Link's racial animus to Frankel, he dismissed Parham's concerns and told Parham that her job depended on "pleasing Heather" – a directive Parham knew to be impossible due to the color of her skin.

6. Additionally, when Parham reluctantly disclosed to Frankel that she suffered from chronic migraines in February 2025, he weaponized this disclosure against her, claiming thereafter that she had "memory retention issues."

7. Parham escalated her concerns of workplace discrimination to Roku's Human Resources department, but Roku's HR representative dismissed and diminished Parham's concerns. Shortly thereafter, Roku terminated Parham's employment, one day before she was scheduled to meet with Human Resources to follow up on her complaint of discriminatory and retaliatory treatment.

8. As set forth in detail below, Defendants' racist and hostile treatment of Parham, and the Company's decision to terminate her employment, were motivated by discriminatory animus on account of her race and disability and in retaliation for her engaging in protected activity.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under 28 U.S.C. § 1331 ("federal question"). This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367(a) because they form part of the same case or controversy as her Section 1981 claims.

10. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the asserted claims occurred herein.

11. On September 22, 2025, Parham filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") in which she alleged that Defendant Roku discriminated against her on the basis of her race and disability and retaliated against her for engaging in protected activity.

12. On January 13, 2026, the EEOC issued Parham a Right-to-Sue letter.

13. On January 13, 2026, the EEOC also issued its Letter of Determination, stating that the EEOC found that Defendants engaged in employment discrimination in violation of Title VII and the ADA.

## PARTIES

14. Plaintiff Jolie Parham is a 25-year old Black woman and a resident of the State of New York.

15. Upon information and belief, Roku, Inc. is a Foreign Business Corporation, incorporated in Delaware, headquartered in California, and licensed to do business in the State of New York, maintaining offices at 5 Times Square, Floor 30, New York, NY 10036.

16. At all times relevant herein, Roku, Inc. was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the ADA, 42 U.S.C. § 12111, the NYSHRL, N.Y. Exec. L. § 292(5), the NYCHRL, N.Y.C. Admin. Code § 8-102, and the NYLL § 740(b).

17. At all times relevant hereto, Plaintiff was a full-time employee of Roku.

18. Upon information and belief, Defendant Cody Frankel is a Senior Manager of Early Careers at Roku and a citizen of the State of New York.

19. Frankel is a person within the meaning of the NYSHRL, N.Y. Exec. L. § 296(1), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

20. Upon information and belief, Defendant Heather Link is a senior account executive at Roku and a citizen of the State of California.

21. Link is a person within the meaning of the NYSHRL, N.Y. Exec. L. § 296(1), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

## STATEMENT OF FACTS

### Parham Commences Employment at Roku and Excels Despite Racism in the Workplace

22. In April 2024, Parham joined Roku as an Account Coordinator, and was assigned to several advertising accounts for automotive companies.

23. Her primary responsibilities involved all aspects of support for the Client Services and Ad Sales teams, including communication with clients, research, operations, management and growth of accounts, and monitoring of campaigns.

24. Parham performed extremely well in this position, so much so that she was often asked to assist on other "verticals" – teams that focus on specific industries or markets such as Technology/Telecommunications or Consumer Packaged Goods – that were not her primary vertical (Automotive).

25. Based on her strong performance, over the course of her tenure, she formally trained seventeen account coordinators and assisted with onboarding many other new hires, including account managers who sat one level above Parham's role.

26. Parham received considerable praise in her role from her first manager, Caylin Gentry, as well as many of the account executives she was assigned to support.

27. On one occasion in December 2024, Ms. Gentry recommended Parham for acceptance into the New York Junior League, an organization of women focused on leadership and community service in New York City, writing that Parham displays "exceptional dedication to excellence," "embodies the values of collaboration, leadership, and service," and "consistently exceed[s] expectations, whether working with clients or internal teams."

28. In August 2024, in recognition of her strong performance, Parham received a raise.

29. From the start of Parham's employment, however, and despite these early successes, Parham was subjected to hostile and condescending treatment by one white senior account executive at the Company, Heather Link.

30. Specifically, Link spoke down to Parham, frequently made inappropriate and racist comments about her and other non-white employees, and assigned her work far outside the scope of her job description and in an amount that exceeded that assigned to any other account executive.

31. Although they worked together consistently for months, Link repeatedly and deliberately called Parham by the wrong first name, laughing almost every time she did so, even when Parham appeared upset or expressed frustration in response.

32. For example, Link referred to Parham as "Joelle," "Juliana," "Josephine," "Julie," "Josie," and at one point even called her "Josh," in an obvious attempt to belittle and insult Parham.

33. In addition, Link often spoke to Parham about her own marijuana use, explaining that she felt compelled to discuss her drug use with Parham "because of who [Parham was]," implying that given her race, Parham must be familiar with drugs.

34. Notably, Parham never discussed drugs or drug use in the workplace, and does not use marijuana.

35. On another occasion, Link told Parham that she wanted a "joint rolled by Snoop Dogg" because "everyone knows that Snoop Dogg rolls an amazing joint," and when Parham said nothing in response, Link followed up by advising Parham, "I worked at BET [Black Entertainment Television] so I know what's up."

36. Additional examples of Link's offensive and racist commentary include Link remarking that Parham's hair was "exotic" and offering to teach her "how to do a brother hug."

37. It was common knowledge among Parham's colleagues that Link was difficult to work with for employees of color, due to her racist stereotyping of non-white employees and repeated, offensive, and discriminatory remarks.

38. Furthermore, Parham personally observed that Link was hostile to other non-white employees at Roku without any legitimate justification.

39. For example, Link demanded that Parham exclude her manager, Caylin Gentry, who is Black, from their communications, because Gentry "made [her] uncomfortable" and because Link did not "feel comfortable telling [Parham] what to do in front of [Gentry.]"

40. Gentry spoke openly with Parham about Link's track record of mistreating Black employees, and often stepped in to protect her (and Marguerite Zeigler, a Black Client Services account manager who also worked for Link until late October 2024) from Link's racist and abusive mistreatment.

41. Upon information and belief, on several occasions, Gentry escalated concerns about Link's racist behavior towards Parham to Link's supervisor, Guy Schueller.

42. However, Schueller told Gentry that he could not and would not tell Link to change or improve her behavior because "it would upset her."

43. Link also frequently made negative and unwarranted comments about other Black employees in Parham's presence, such as telling Parham that "Caylin is underqualified for her position" and that Zeigler wasn't "good enough at her job."

44. Notably, when making these disparaging remarks, Link did not cite to any legitimate business rationale underlying her negative opinions of Gentry and Zeigler.

45. Parham did not observe Link making similarly derogatory remarks about white employees.

**<u>Roku's Discrimination against Parham Worsens When She Is Assigned a New Manager</u>**

46. In October 2024, Parham was assigned a new manager, Cody Frankel, a white man, though Parham continued to support Link in her day-to-day responsibilities.

47. In November 2024, Parham escalated her concerns of discriminatory treatment by Link to Frankel, including providing specific detail as to the numerous racist remarks made to her by Link.

48. Parham met with Frankel and advised him that she was uncomfortable working with Link based on Link's apparent discriminatory animus, and that prior attempts by Gentry to correct Link's racist behavior had been unsuccessful.

49. Like Schueller before him, Frankel was dismissive of Parham's concerns, and sought to avoid the topic for the rest of the meeting with Link.

50. Over the next several months, during numerous one-on-one meetings with Frankel, Parham continued to raise her concerns about Link's racist comments and treatment, which had worsened once Gentry was no longer acting as Parham's supervisor and intermediary when needed.

51. On several occasions, Parham explicitly told Frankel about Link's discriminatory comments, stating that as a Black woman, she believed Link to be biased against her, and emphasizing that Link made comments that made her uncomfortable as a Black woman.

52. On each of these occasions, Frankel was dismissive of concerns about Link's behavior and history of mistreating Black employees. Instead, Frankel suggested that Parham

was misunderstanding Link's behavior, that the issues were due to "miscommunications," and that Parham was ultimately the problem because she was failing to support Link.

53. Frankel further advised Parham that her continued success at the Company depended on "pleasing" Link, implying that if she continued to complain, she would find herself without a job.

54. Parham was devastated by Frankel's dismissive attitude and the baseless allegation that she was failing to fulfill her responsibilities.

55. Throughout November and December, Parham repeatedly confirmed with other account executives and team members to whom she reported that she was fulfilling all her responsibilities and had been performing well in her role.

56. On December 19, 2024, Parham met with Jenna (née Latushko) Scavone, a senior account manager, who validated Parham's concerns about Link's conduct and advised that Link's behavior towards Parham was "disgusting but unsurprising" based on Link's behavioral history.

57. Scavone also opined that Frankel was negligently failing to escalate her concerns of racist behavior and that his accusations regarding Parham's performance were unsupported. Nonetheless, Scavone advised Parham to "keep [her] head down" in order to avoid retaliation by Frankel, Link, and the Company.

58. In or about mid-January 2025, the Client Services/Ad Sales Department underwent a team reorganization.

59. As part of this reorganization process, supervisors—including Frankel—actively solicited input from account managers and account coordinators regarding their preferred alignment with account executives moving forward.

60. Accordingly, on January 17, 2025, Parham asked Frankel to be moved to a different team, away from Link.

61. Frankel refused Parham's request, without stating any reason for his refusal.

62. Once again, Frankel failed to acknowledge the concerns of discriminatory treatment Parham had consistently raised.

63. Upon information and belief, around this time, two other account managers indicated to Gentry (Parham's former manager) that they did not wish to work with Link as well, and Gentry granted their requests.

64. As one particularly egregious example of Link's racist behavior, at a client outing in late January 2025, Link spoke offensively in a large group about the varying colors of individuals' genitalia based on race.

65. More specifically, Link was seated at a table with Parham and two client representatives from Nissan, and, while apparently intoxicated, spoke about the difference in color of vaginas based on respective races.

66. During the conversation, Link stated, "I have a pretty pink vagina."

67. Though Parham kept trying to change the subject, Link persisted, even asking one of the client representatives who was Hispanic, "What about you?"

68. Deeply uncomfortable, the client representative equivocated and responded, "I bet you can guess," to which Link responded, "But I want to know!"

69. Throughout this conversation, Parham felt extremely uncomfortable and offended, as did many others present.

**<u>Link Frequently Advises Parham to Engage in Unethical Business Practices and Parham Objects</u>**

70. Throughout her employment with the Company, Link frequently directed Parham to misrepresent campaign data and execution in order to increase spend, secure future/return business, and avoid the consequences of underdelivering to clients (which typically involved either redistributing into a future investment or returning money to the client).

71. More specifically, Link routinely provided clients with fabricated Roku viewership data in order to meet delivery promises that could not be fulfilled through legitimate means.

72. Despite clients contractually specifying targeting parameters and exclusions (such as excluding specific demographics, viewers, or channels, from total viewership counts), Link instructed Parham to remove these targeting constraints mid-campaign when delivery metrics fell short.

73. As a result, end-of-campaign reporting, which should have accurately reflected campaign performance in accordance with the clients' contracts with Roku, was consistently changed and manipulated at Link's direction.

74. Link also lied to clients about which channels and types of content resulted in the highest views of their advertisements so that she could then attempt to sell Roku sponsorships for those channels/content types.

75. On or around late November or early December 2024, Parham raised concerns to Frankel regarding Link's practice of providing misinformation to clients, on the good faith belief that Link's practices and directives violated both FTC regulations and was in breach of Roku's contracts with its clients, but Frankel abruptly dismissed Parham's concerns.

**Parham's Health Declines, Resulting In Disability Discrimination by the Company, and Parham Escalates Her Concerns to Human Resources**

76. Beginning on or around January 30, 2025, Parham started experiencing panic attacks as a result of the hostile work environment to which she was being subjected and the lack of a meaningful response by the Company to her expressions of concern about Link's conduct.

77. Around the same time, Parham met with a Company Human Resources representative, Syeda Ali, in another attempt to escalate her concerns about Link's racist behavior and Frankel's enablement.

78. In response to Parham raising clear concerns of discriminatory treatment, Ali told Parham, "I'm a business professional, not a camp counselor. Keep your head down and do your work, because at the end of the day we're all just here for a paycheck."

79. Once again, Parham was devastated by Roku's utter failure to respond to her complaints of discrimination.

80. Soon after this meeting, Parham was prescribed medication by a psychiatrist to help her manage the panic attacks and distress directly caused by the discrimination she was experiencing in the workplace.

81. The stress and anxiety that was directly caused by the discrimination Parham was experiencing at the Company also caused her chronic migraine condition to flare up.

82. In early February 2025, Parham met with Ali again and disclosed to her that she (Parham) suffered from chronic migraines, and that she was concerned that if she needed to work from home at any point due to a migraine, she might face further retaliatory behavior from Frankel.

83. Parham also explained to Ali that she felt that any choice she made to protect her own health would be used against her.

84. Once again, Ali dismissed Parham's concerns, and insisted that she tell Frankel about her chronic migraines, stating, "You can't just blindside him, you have to tell him these things or he won't believe you."

85. Accordingly, Parham reluctantly disclosed to Frankel that she suffered from chronic migraines, but emphasized that her recent migraine (and any future migraines) did not negatively impact the quality of her work.

86. In response, Frankel used Parham's personal medical disclosure against her when providing performance feedback, stating on several occasions, including in writing, that she appeared to be having "memory retention issues" in connection with her migraines, even though this was not (and is not) a symptom of Parham's migraines.

87. Parham was surprised and offended by Frankel's baseless allegation and explained to Frankel that her memory was not affected by her migraine condition.

88. On February 11, 2025, Ali followed up on Parham's complaint of discrimination, but failed to offer any meaningful guidance or recourse.

89. Instead, it was clear that Ali's intention was to protect herself and the Company from any potential fallout, as she did not offer any material support but stated only, "I just don't want you telling anyone we didn't help you."

90. Instead of protecting Parham from further discriminatory and retaliatory treatment, Ali encouraged Parham to "try to see the situation from Frankel's perspective," praised Frankel as a "trailblazer," and suggested that Parham ignore the discriminatory conduct because "Cody might not have time to deal with this."

91. Ali also stated that unless Parham could provide any evidence of mistreatment or discrimination in writing, the Company would not take her seriously, stating: "Those are just claims, and it's just he said/she said."

92. Around this time, other account coordinators began to joke that Parham was "fighting for her life every day," in reference to her efforts to work harder and for longer hours than every other coordinator while also enduring bullying and racist mistreatment.

93. The other account coordinators also began referring to their own busier work days as "Jolie days."

**Frankel Directs Parham to Exclusively Support Link, Despite Parham's Repeated Complaints of Discrimination, and Soon Thereafter Terminates Her Employment**

94. On February 12, 2025, Frankel removed Parham from all of the other teams she worked on except for Link's team, such that she reported exclusively to Link instead of to the three different account executives who she had previously been supporting in addition to Link.

95. Upon information and belief, Frankel made this decision in retaliation against Parham for her prior complaints of discrimination, in order to set her up for failure at the Company.

96. As a result of Frankel's decision, Parham's mental health worsened and her panic attacks escalated.

97. Nevertheless, due to her strong work ethic and her continued desire to succeed at the Company, Parham continued to work overtime to meet Link's increasingly impossible demands.

98. On March 20, 2025, in a meeting recapped subsequently by email, Frankel claimed that Parham was failing to support Link, and that she had "ongoing challenges with accountability, deflect[ed] blame when mistakes or issues arise, and a lack of attention to detail."

99. Parham was shocked by this surprising and baseless feedback, as she knew she had been fulfilling responsibilities well above her pay grade and was working much harder and longer than every other account coordinator within the Company at the time.

100. Moreover, Link had not previously flagged any specific and substantive deficiencies with Parham's work.

101. On March 24, Parham emailed Frankel a detailed rebuttal, providing missing context for his meritless criticisms, but emphasizing that she was still "eager to continue contributing to the team in a way that helps everyone succeed."

102. Parham then forwarded her response to Human Resources and requested a meeting with Ali on April 1 to discuss Frankel's continued campaign of harassment and retaliation.

103. However, before Parham could meet with Human Resources on April 1 to discuss Frankel's retaliatory treatment, Frankel terminated Parham's employment on March 31, 2025.

104. At the termination meeting, Frankel told Parham that their workstyles did not align, and that Link had had "issues" with Parham for far too long.

105. On the day she was terminated, Parham was only days away from being 50% vested in her shares at the Company.

106. The termination of Parham's employment was the culmination of almost a year of discriminatory treatment and harassment, and constitutes retaliation based on her vocal and documented opposition to unlawful practices and behavior.

107. Roku's purported rationale for separation strains credulity, given a glaring absence of documented performance deficiencies; the frequency with which Parham was asked to assist on other tasks outside the scope of her regular workload based on her strong skills and

contributions; Roku's reliance on Parham to train new hires; and the excellent performance feedback from Parham's first manager, Caylin Gentry.

108. Upon information and belief, in the wake of Parham's abrupt termination from the Company, Frankel inappropriately interrogated account coordinators who she previously interacted with, as well as other team members, about the quality of Parham's work for several weeks after the termination of Parham's employment, in a blatant and unprofessional attempt to damage her reputation and to retroactively craft a justification for the unlawful termination of her employment.

109. Upon information and belief, Frankel regularly continues to speak negatively about Parham to other Roku employees, long after she has left the Company, in retaliation for Parham alleging legal claims against the Company.

110. Upon information and belief, Roku's discriminatory treatment of non-white employees at the Company is not limited to Parham.

111. Upon information and belief, in the wake of Parham's termination, other employees of color who have remained at Roku have joked amongst themselves that they work at "Roku Klux Klan."

**Parham Experienced Discrimination and Retaliation on the Basis of Race and Disability**

112. Parham was subjected to differential and adverse treatment by Defendants on the basis of her race and disability.

113. Parham's race and disability were motivating factors in Defendants' decision to mistreat her, retaliate against her for opposing discrimination in the workplace, and terminate her employment.

114. The actions of Defendants described above were undertaken willfully, intentionally, maliciously and with reckless indifference to Parham's protected rights.

115. As a result of Defendants' discriminatory and retaliatory treatment and termination of Parham, Parham was denied income, benefits, and other perquisites of employment, including continuing opportunities for promotion, advancement, recognition, and increased compensation that she otherwise would have received.

116. In addition, as a result of Defendants' discriminatory and retaliatory treatment and termination of Parham, Parham has sustained severe mental and emotional harm and distress.

## FIRST CAUSE OF ACTION
***Discrimination on the Basis of Race in Violation of 42 U.S.C. Section 1981 Against All Defendants***

117. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

118. As a result of the aforesaid acts, Defendants have discriminated against Plaintiff on account of her race in violation of 42 U.S.C. Section 1981.

119. As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## SECOND CAUSE OF ACTION
***Retaliation in Violation of 42 U.S.C. Section 1981 Against All Defendants***

120. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

121. As a result of the aforesaid acts, Defendants retaliated against Plaintiff for opposing discrimination in the workplace in violation of 42 U.S.C. Section 1981 by subjecting

her to a hostile work environment and terminating Plaintiff's employment in retaliation for her protected activity.

122. As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**THIRD CAUSE OF ACTION**
***Discrimination on the Basis of Race in Violation of Title VII Against Roku, Inc.***

123. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

124. As a result of the aforesaid acts, Defendant Roku discriminated against Plaintiff on account of her race in violation of Title VII, 42 U.S.C. § 2000e-2(a).

125. As a result of Defendant Roku's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**FOURTH CAUSE OF ACTION**
***Retaliation in Violation of Title VII Against Roku, Inc.***

126. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

127. As a result of the aforesaid acts, Defendant Roku retaliated against Plaintiff for opposing discrimination in the workplace in violation of Title VII, 42 U.S.C. § 2000e-3(a), by subjecting her to a hostile work environment terminating Plaintiff's employment in retaliation for her protected activity.

128. As a result of Defendant Roku's retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**FIFTH CAUSE OF ACTION**
***Discrimination on the Basis of Disability in Violation of the ADA Against Defendants Roku, Inc. and Cody Frankel***

129. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

130. As a result of the aforesaid acts, Defendants Roku, Inc. and Cody Frankel discriminated against Plaintiff on account of her disability in violation of the ADA, 42 U.S.C. § 12112(a) by subjecting her to a hostile work environment and by terminating Plaintiff's employment on the basis of discriminatory animus.

131. As a result of Defendants Roku, Inc. and Cody Frankel's discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**SIXTH CAUSE OF ACTION**
***Discrimination on the Basis of Race in Violation of the NYSHRL Against All Defendants***

132. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

133. As a result of the aforesaid acts, all Defendants discriminated against Plaintiff on account of her race in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. including § 296(1)(a).

134. As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**SEVENTH CAUSE OF ACTION**

***Discrimination on the Basis of Disability in Violation of the NYSHRL Against Roku, Inc. and Cody Frankel***

135. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

136. As a result of the aforesaid acts, Defendants Roku, Inc. and Cody Frankel discriminated against Plaintiff on account of her disability in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. including § 296(1)(a).

137. As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**EIGHTH CAUSE OF ACTION**

***Retaliation in Violation of the NYSHRL Against All Defendants***

138. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

139. As a result of the aforesaid acts, Defendants retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*. including § 296(7), by subjecting her to a hostile work environment and by terminating Plaintiff's employment in retaliation for her protected activity.

140. As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**NINTH CAUSE OF ACTION**
***Aiding and Abetting Discrimination in Violation of the NYSHRL Against Cody Frankel***

141. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

142. As a result of the aforesaid acts, Defendant Cody Frankel aided, abetted, incited, compelled and coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. Law §296(6).

143. As a result of Defendant Cody Frankel's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**TENTH CAUSE OF ACTION**
***Aiding and Abetting Discrimination in Violation of the NYSHRL Against Heather Link***

144. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

145. As a result of the aforesaid acts, Defendant Heather Link aided, abetted, incited, compelled and coerced acts forbidden under the New York State Human Rights Law, N.Y. Exec. Law §296(6).

146. As a result of Defendant Heather Link's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment

opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**ELEVENTH CAUSE OF ACTION**
***Discrimination on the Basis of Race in Violation of the NYCHRL Against All Defendants***

147. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

148. As a result of the aforesaid acts, all Defendants discriminated against Plaintiff on account of her race in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a).

149. As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**TWELFTH CAUSE OF ACTION**
***Discrimination on the Basis of Disability in Violation of the NYCHRL Against Roku, Inc. and Cody Frankel***

150. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

151. As a result of the aforesaid acts, Defendants Roku, Inc. and Cody Frankel discriminated against Plaintiff on account of her disability in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(1)(a).

152. As a result of Defendants' discriminatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**<u>THIRTEENTH CAUSE OF ACTION</u>**
***Retaliation in Violation of the NYCHRL Against All Defendants***

153. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

154. As a result of the aforesaid acts, Defendants retaliated against Plaintiff for opposing discrimination in the workplace in violation of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7), by subjecting her to a hostile work environment and terminating Plaintiff's employment in retaliation for her protected activity.

155. As a result of Defendants' retaliatory and adverse acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**<u>FOURTEENTH CAUSE OF ACTION</u>**
***Aiding and Abetting Discrimination in Violation of the NYCHRL Against Cody Frankel***

156. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

157. As a result of the aforesaid acts, Defendant Cody Frankel aided, abetted, incited, compelled and coerced acts forbidden under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6).

158. As a result of Defendant Cody Frankel's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**<u>FIFTEENTH CAUSE OF ACTION</u>**
***Aiding and Abetting Discrimination in Violation of the NYCHRL Against Heather Link***

159. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

160. As a result of the aforesaid acts, Defendant Heather Link aided, abetted, incited, compelled and coerced acts forbidden under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(6).

161. As a result of Defendant Heather Link's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

**SIXTEENTH CAUSE OF ACTION**
***Retaliation in Violation of the New York Labor Law §740 Against Roku, Inc.***

162. Plaintiff repeats and realleges the allegations in the paragraphs above as if fully set forth herein.

163. Plaintiff disclosed to Defendant Roku. Inc. an activity, policy or practice of the Company that Plaintiff, in good faith, reasonably believed was in violation of a New York State law, rule or regulation.

164. Defendant Roku., Inc. terminated Plaintiff's employment in retaliation for Plaintiff's disclosure.

165. As a result of the aforesaid acts, Defendant retaliated against Plaintiff in violation of the New York Labor Law § 740 by constructively discharging Plaintiff's employment because Plaintiff opposed an activity, policy and/or practice in the workplace that Plaintiff reasonably believed to be in violation of law, rule or regulation.

166. As a result of Defendant's unlawful acts, Plaintiff suffered damage, including, without limitation, deprivation of income and benefits, loss of employment opportunities, emotional pain, suffering, inconvenience, mental anguish, humiliation, loss of enjoyment of life, and damage to reputation and career.

## JURY DEMAND

167. Plaintiff hereby demands trial by jury.

**WHEREFORE,** Plaintiff respectfully requests that the Court grant judgment for Plaintiff and that it order and award Plaintiff the following relief against Defendants:

(1) A declaratory judgment that the acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured by 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 ("Section 1981"), Title VII, 42 U.S.C. §2000e *et seq*, the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq*., the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq*., the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*., and the New York Labor Law § 740 *et seq*;

(2) Actual damages in the form of:

a. back pay, front pay, and lost benefits had she not been wrongfully terminated in an amount to be proved at trial;

b. reimbursement for social security, experience, training opportunities, and other benefits, in an amount to be proved at trial;

(3) Compensatory damages for emotional pain and suffering, inconvenience, mental anguish, humiliation, and loss of reputation in an amount to be proved at trial, but believed to exceed $250,000;

(4) Liquidated damages and penalties as provided for by the NYLL in an amount to be shown at trial;

(5) Punitive damages against all defendants in an amount to be determined at trial;

(6) Statutory attorneys' fees, costs and disbursements;

(7) Interest; and

(8) Such additional relief as the Court deems just and proper.

Dated: April 10, 2026
New York, New York

BANTLE & LEVY LLP

*/s/ Sherie Buell*
Sherie N. Buell
Natalie Chew
99 Park Avenue, Suite 1510
New York, NY 10016
(212) 228-9666
*Attorneys for*
*Plaintiff Jolie Parham*